NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-668

CARE AND PROTECTION OF GLENDA.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother appeals from a judgment issued by a Juvenile Court judge pursuant to G. L. c. 119, § 26, finding the mother currently unfit to parent her child, Glenda, and committing the child to the permanent custody of the Department of Children and Families (DCF).[2] The mother argues that the judge, in finding the mother unfit to care for the child, improperly focused on the mother's care of the child's younger brother. The mother also claims that the judge erred in finding her unfit to parent the child by clear and convincing evidence. We affirm.

---

[1] A pseudonym.

[2] In addition to finding the mother unfit to parent the child, the judge found that the father was unfit. He did not appeal. The judge also found that DCF had not made reasonable efforts toward reunification, and ordered DCF to update the parents' action plan, convene a permanency planning conference to determine a goal for the family, provide the mother with weekly visits with the child, and confirm participation with all collaterals on a monthly basis.

1.  Focus on the younger brother.  The mother argued that the trial judge's focus on the mother's care of the child's younger brother was improper.  We disagree.  The mother is correct that "[a] determination of parental unfitness must be child-specific" and must focus on the particular child at issue. Adoption of Ramona, 61 Mass. App. Ct. 260, 263 (2004), citing Custody of a Minor, 21 Mass. App. Ct. 1, 7 (1985).  It is also true, however, that a parent's care for a child's sibling may bear on the parent's fitness to care for the subject child.  See Adoption of Carla, 416 Mass. 510, 513 (1993) (stating that parent's fitness to raise one child is relevant to their fitness to raise sibling, and noting that "a parent may be fit to raise one child and unfit to raise another," but parent may also "be unfit to raise any child" [citation omitted]).

In this case, the trial judge found that the mother had missed several medical appointments for the younger brother, who had a number of specialized health needs.  The younger brother was born premature and spent three months in the neonatal intensive care unit (NICU) before being discharged to the mother's custody.  He was diagnosed with failure to thrive and needed a nasal gastro tube to be fed.  When the tube became dislodged, medical providers requested that he be brought to the hospital immediately, as he needed to be fed every three hours, but the mother did not bring him in until the next day, at which

2

point he had lost 1.5 ounces.  The mother later failed to bring the younger brother to several other medical appointments, and he lost more than one pound while in her care.  The younger brother was ultimately removed from the mother's custody due to medical neglect.

The mother challenges this focus on the younger brother, as the case at hand is not about him, but about Glenda.  The trial judge did not, however, consider only the mother's medical neglect of the younger brother; indeed, the trial judge also focused on the mother's medical neglect of Glenda, and even of herself, in coming to the conclusion that the mother was unfit to parent the child.

Although the child does not have as many specialized health needs as the younger brother, she has required specialized care. The child was born one month premature and spent one month in the NICU before being discharged to the mother's care. Approximately one month after the child's birth, shortly after the child was released from the NICU, the mother failed to bring her in for her initial follow-up medical appointment.  The mother then failed to bring her to the following seven rescheduled appointments.  Although the mother contends that the child had "no chronic medical issues," the trial judge came to the reasonable conclusion that failure to bring the child to her first follow-up appointment after being released from the NICU

3

(and seven attempts at rescheduling) constituted medical neglect.

The trial judge also found that the mother has not managed her own health consistently. A parent's failure to seek medical treatment for herself can result in danger to the child. See Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption, 16 Mass. App. Ct. 965, 965 (1983). The mother has several physical and mental health diagnoses, including diabetes, epilepsy, asthma, posttraumatic stress disorder (PTSD), and bipolar disorder, and she also has a history of substance abuse. Despite these health issues, the mother has been inconsistent with her treatment. She attended only four appointments with her neurologist between the summer of 2020 and December 2021, and has since missed several more appointments. She attended a few appointments for trauma therapy during the summer of 2021, but stopped soon after in the fall of 2021. Similarly, she attended one appointment with a psychiatrist, but declined to attend the follow-up appointment. The mother later began individual therapy, but when her regular therapist went on leave for approximately six months, the mother did not engage in therapy with the substitute therapist. The mother has also misrepresented her treatment to DCF, stating that she had weekly appointments with her substance abuse counsellor despite the

fact that, according to the counsellor, they did not have a regular meeting schedule.

The incident that precipitated the child's removal demonstrates how the mother's failure to care for her own health could impact the child. The mother had a medical marijuana card, as she used marijuana to treat her epilepsy. On the day of the child's removal, the mother purchased marijuana from an acquaintance rather than using her medical marijuana card at a dispensary. After using this marijuana, the mother lost consciousness and had to be taken to the hospital, where she tested positive for cocaine. The mother stated that she believed the marijuana was laced with cocaine. The child was in the home sleeping when this occurred. Although the child was asleep and the mother's brother was also in the home, he was asleep and not acting as a sober caretaker for the child. Based on this incident, the trial judge could reasonably conclude that the mother's failure to properly treat her epilepsy could place the child at risk if returned to the mother's custody.

Taken together with the mother's failure to maintain her own health properly and her medical neglect of the child, the mother's medical neglect of the younger brother was not an improper consideration for the trial judge, as it offered evidence of a pattern of behavior and therefore had prognostic value. Adoption of Abigail, 23 Mass. App. Ct. 191, 196 (1986).

5

2. <u>Sufficiency of the evidence</u>.  The mother also argues that the evidence was insufficient to prove by clear and convincing evidence that she was unfit to parent the child.  We disagree, as there was significant evidence supporting the trial judge's decision, including the mother's medical neglect of the child, the mother's unsafe use of marijuana, the environment of domestic violence, and the mother's inconsistent visitation with the child.

For a judge to commit a child to DCF's custody, DCF must prove, "by clear and convincing evidence, that a parent is currently unfit to further the best interests of a child."  <u>Care & Protection of Erin</u>, 443 Mass. 567, 570 (2005).  A finding that a parent is unfit requires "more than ineptitude, handicap, character flaw, conviction of a crime, unusual life style, or inability to do as good a job as the child's foster parent." <u>Adoption of Katharine</u>, 42 Mass. App. Ct. 25, 28 (1997).  The judge must instead find "'grievous shortcomings or handicaps' that put the child's welfare 'much at hazard.'"  <u>Id</u>., quoting <u>Petition of New England Home for Little Wanderers to Dispense with Consent to Adoption</u>, 367 Mass. 631, 646 (1975).

a. <u>Marijuana use.</u>  In addition to the medical neglect of the child, described above, the trial judge relied on the mother's unsafe use of marijuana in finding her currently unfit to parent the child.  Substance abuse is a relevant

6

consideration in a determination of unfitness if the substance abuse interferes with a parent's ability to provide minimally acceptable care of the child.  See Adoption of Katharine, 42 Mass. App. Ct. at 31.

The mother has consistently used marijuana since the age of eighteen, and she uses it to treat her epilepsy.  Against medical advice, the mother used marijuana while pregnant with the child.  The trial judge found that the mother's marijuana use during her pregnancy "contribut[ed] to [the child] being born premature," a finding the mother does not contest as clearly erroneous, though she does note there is evidence that might support an opposite conclusion.  She did disclose her marijuana use to her medical providers, causing the child to be labeled a substance-exposed newborn (despite the fact that both the mother and child tested negative for all substances).  The mother claimed she was not told by medical providers to stop using marijuana while pregnant, but the trial judge did not credit that statement.  At trial, the mother testified that she continued to use marijuana one to two times per week.

As noted above, the child was removed following the mother's collapse after she used marijuana that she purchased from an acquaintance rather than a dispensary, and which she later claimed to have come to believe was laced with cocaine after a urine screen came back positive for cocaine.  At the

7

time of the incident, emergency workers noticed marijuana wrappers and a "heavy odor of marijuana" in the mother's apartment.

After the child's removal, DCF created a medical marijuana safety plan with the mother that included "1) no smoking in the apartment with the child[] present, 2) having a sober adult present in the apartment when Mother was under the influence, 3) following Mother's medical providers' advice on intake amount, 4) only buying from medical marijuana dispensaries, 5) and storing the medical marijuana safely in a lockbox provided by [DCF]." Despite this safety plan, after each of four overnight visits with the mother, the child would return to her foster family with an odor of marijuana, which led the trial judge to conclude that the mother "continued to use substances in the presence of [the child]," a finding that is not, as the mother claims, clear error given the evidence that there was an odor of marijuana on the child after overnight visits, in the apartment, and in mother's car, even if the odor in the apartment was not of concern to the social worker. And at the time of trial, the mother continued to smoke marijuana despite being pregnant.

According to G. L. c. 94G, § 7 (d), "[a]bsent clear, convincing and articulable evidence that the person's actions related to marijuana have created an unreasonable danger to the safety of a minor child," legal possession and consumption of

8

marijuana shall not "form the sole or primary basis for substantiation, service plans, removal or termination or for denial of custody, visitation or any other parental right or responsibility."  In this case, the mother's unsafe marijuana use did create an unreasonable danger to the safety of the child.  On the day of the child's removal, the mother used marijuana from an unregulated source and had to be brought to the hospital, leaving the child in her apartment while no sober caretaker was present and awake.  Additionally, after a marijuana safety plan was put in place, the judge found that the mother was not following it, as she was using marijuana in the presence of the child.  Even if the mother's marijuana use did not create an unreasonable danger to the safety of the child, it was not the sole basis for the judge's finding of unfitness, as the judge also relied on the mother's pattern of medical neglect, including of the child, the environment of domestic violence, and her inconsistent visitation with the child.

b.  Domestic violence.  In his determination that the mother was unfit to parent the child, the judge considered the fact that the majority of the mother's relationships have involved domestic violence.  "[A] judge must consider issues of domestic violence and its effect upon the child[] as well as a parent's fitness."  Adoption of Gillian, 63 Mass. App. Ct. 398, 404 n.6 (2005).

9

The mother's relationship with the father involved verbal and emotional abuse. The mother never sought a restraining order against the father. After the mother's relationship with the father ended, she entered a relationship with the younger brother's father, and this relationship also involved domestic violence. The details of the domestic violence are known to the parties and need not be recounted here. What is relevant is that, despite numerous instances of domestic violence with the younger brother's father, several of which involved physical abuse, the mother continued her relationship with him for over a year after the first incident and even lived with him. The mother also declined to pursue a restraining order against him, and failed to report certain incidents to DCF. The younger brother's father was eventually arrested due to an incident of domestic violence with the mother, and then was released from incarceration several months later. The mother testified that she has not had contact with him following his release, but the trial judge did not credit that testimony. Although there was no evidence that the child ever witnessed any domestic violence, the trial judge did not err in considering the effect that domestic violence could have if the child were returned to the mother's custody, as "[i]n determining parental fitness a judge may use past conduct to predict future ability and performance." Custody of Michel, 28 Mass. App. Ct. 260, 269-270 (1990).

10

c. Inconsistent visitation. Finally, the judge considered the mother's inconsistency in visiting the child in his determination that the mother was unfit to parent the child. This was an appropriate consideration for the trial judge in determining the mother's unfitness, as "the refusal of the parents to maintain service plans, visitation schedules, and counseling programs designed to strengthen the family unit are relevant to the determination of unfitness." Petitions of the Dep't of Social Servs. to Dispense with Consent to Adoption, 399 Mass. 279, 289 (1987).

After the child was removed from the mother's custody, the mother was initially consistent with her visitation. However, by November 2021, the mother's visitation became much more inconsistent. Because the mother cancelled numerous visits, she did not attend any visits with the child in November or December, and attended only one visit in January and one in February. Then in March, she once again had no visits. Although the mother attended several visits in April, she still cancelled three visits, and in May, she had only one visit, because she cancelled four. The mother's visits with the child were suspended for several months following the younger brother's removal, but were reinstated in July 2022. Even after that months-long break in visitation, the mother continued to cancel several visits over the following months.

11

3.  Conclusion.  Based on all of the above considerations, there was sufficient evidence for the trial judge to find by clear and convincing evidence that the mother was, at the time of trial, currently unfit to parent the child.

Judgment affirmed.

By the Court (Rubin,
 Massing & Desmond, JJ.[3]),

Assistant Clerk

Entered:  April 4, 2024.

---

[3] The panelists are listed in order of seniority.